IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 23, 2009

## STATE OF TENNESSEE v. FLINT GREEN

**Direct Appeal from the Criminal Court for Sullivan County**
**No. S53,156     Robert H. Montgomery, Jr., Judge**

_____

**No. E2008-01792-CCA-R3-CD - Filed April 6, 2010**

_____

The appellant, Flint Green, was convicted by a jury in the Sullivan County Criminal Court of possession of 26 grams or more of cocaine with the intent to sell, a Class B felony, and possession of marijuana, a Class A misdemeanor. The trial court imposed a total effective sentence of twenty years incarceration in the Tennessee Department of Correction. On appeal, the appellant challenges the sufficiency of the evidence supporting his convictions and the trial court's refusal to grant his motion for a new trial based upon two jurors observing him "in custody" during trial. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Randall D. Flemming, Kingsport, Tennessee, for the appellant, Flint Green.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and Kent Chitwood, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

At trial, Officer Mark Johnson with the Kingsport Police Department testified that on November 16, 2006, he and other officers went to a Microtel hotel looking for a robbery suspect. Officer Johnson said that when he first arrived at the hotel, he drove around to the back parking lot to look for vehicles or anything that could be dangerous for police. Seeing

nothing in the parking lot or on the ground, he drove to the front of the hotel and met two other officers. The hotel clerk gave the officers the numbers of three rooms on the second floor, including room 209, and the officers went upstairs to the hall where the rooms were located.

The officers planned to knock on the doors of the rooms to try to gain entry and locate the robbery suspect. However, before the officers were able to knock on room 209, the door opened and a female, Melissa Prater, stepped out. When she saw the officers, she screamed. Officer Johnson moved in, thinking the situation was threatening. The officers repeatedly identified themselves as police. The door to the room started to close, and through a crack in the door Officer Johnson saw a "small framed person" with long dark hair on the other side of the door. Officer Johnson shoved his shotgun in the door to prevent it from closing. The officers kicked the door open. Officer Mike Hickman saw someone jump out of the room's window, a twenty- or twenty-five-foot drop. Ultimately, Cortez Gore, the man who jumped from the window, was apprehended and brought back to the hotel.

Kingsport Police Officer Mike Hickman testified that in the early morning hours of November 16, 2006, he responded to the Microtel to look for robbery suspects, black males whom he had been told were in a couple of rooms on the second floor of the hotel. The officers went upstairs to knock on the doors of the rooms to discern if the suspects were inside. Officer Hickman, Officer Johnson, and Officer Jason McClain stationed themselves outside of room 209 with their guns drawn. Before the officers could knock, Prater came outside and screamed when she saw police. Officer Hickman looked into the room and saw a slim black male wearing a white t-shirt jump from the second-story window.

Officer Hickman said someone inside the room tried to close the door. The officers informed the occupants of the room that they were police and ultimately gained entry into the room. Officer Hickman entered the room first and immediately went to the window to see what happened to the jumper. He saw a black male running through the parking lot toward a Waffle House restaurant. Officer Hickman looked on the ground beneath the window and saw a cellophane package he thought contained drugs.

Inside the room, Officer Hickman saw marijuana and a "stripped out cigar blunt" containing marijuana on the nightstand. He also saw a roll of money, containing approximately $650, on the floor by the nightstand. Two people were in the room, sitting on the bed: a white female, Rita Moore, and a black male, the appellant. Officer Hickman asked the occupants of the room about the marijuana and the money. The appellant said that he did not know to whom the money belonged, but he eventually acknowledged that the marijuana was his. The appellant also acknowledged that the room was registered to him.

-2-

Officer Hickman said that a sandwich bag containing several individually packaged crack cocaine rocks, powder cocaine, and some pills that appeared to be Xanax was found beneath the window.

Cortez Gore testified that in March 2006, he moved to Tennessee from South Carolina. He stated that he was the appellant's nephew and that before November 16, 2006, he had met the appellant three or four times. At midday on November 16, 2006, the appellant stopped by the house Gore shared with his cousin, Derrick Lewis. Gore said that while they were "hang[ing] out," the appellant showed him some crack cocaine.

Gore stated that later that day, he, the appellant, and Lewis' girlfriend, Rita Moore, went to the Microtel. Gore rented a room, and the appellant was in a room on the same floor. Gore said he immediately went to his room, but Moore called him to come to the appellant's room "to smoke and get drunk." Gore said he knew Moore and the appellant had alcohol and marijuana, and based upon the appellant's earlier demonstration, he believed the appellant had crack cocaine. Gore said he was going to try to get some of the appellant's crack cocaine to sell it. Gore acknowledged that in a statement to police, he referred to the cocaine as "work," explaining that he would not have said "work" if he had intended to smoke it himself.

As he was walking to the appellant's room, Gore saw Prater enter the appellant's room and close the door. Gore went into the room and started "rolling" the marijuana. He did not see any money or guns in the appellant's room. A short while later, Prater opened the door and, upon seeing someone with a shotgun, started screaming. Because of the screaming and because he did not know who was outside the door with a shotgun, Gore jumped out the window.

Gore said that as he jumped out the window, "I seen something white come out the window. I just took off running before I seen it." He said he looked back briefly when he landed but started running before the white object touched the ground. He denied knowing what the white object was.

Gore said that he never saw the appellant smoke any crack cocaine. Additionally, he did not see any "cocaine paraphernalia," such as a "crack pipe," in the appellant's room. Gore acknowledged that during the day he drank two and one-half beers, smoked marijuana, and took numerous Xanax pills. He maintained that he was "intoxicated or impaired" at the time police arrived at the appellant's room. Gore said, based upon the events at the Microtel, he pled guilty to possession of cocaine with intent to sell.

Kingsport Police Officer Billy Boyd testified that on November 16, 2006, he went to the Microtel as a backup officer. When Gore ran from the hotel after jumping from room 209, Officer Boyd and Officer Todd Ide chased him on foot. They apprehended Gore and brought him back to room 209.

Officer Boyd then assisted in a search of room 209. Inside a closet was a black duffel bag containing two loaded semi-automatic pistols: a .40 caliber Glock pistol and a 9 millimeter pistol.

Tennessee Bureau of Investigation Agent Sharon Norman testified that she was the forensic chemist who tested the drug evidence obtained by police at the Microtel. She said the bag found under the window contained several "rocks" that were cocaine base and weighed a total of 30.6 grams. The bag also contained one .2 milligram alprazolam (Xanax) pill, one half of a .2 milligram alprazolam pill, and four .5 milligram alprazolam pills. The pills were inside several clear plastic bags which had been cut and tied so that the pills were separate from the crack cocaine.

Kingsport Police Detective Tim Crawford, who was qualified as an expert in the "field of drug activity in the Kingsport area," testified that after the occupants of room 209 were taken into custody, he was called to the scene. Detective Crawford spoke with Prater and, upon determining she had no involvement with the drugs, allowed her to leave. Based upon the various items in the room, the remaining occupants of room 209 were arrested.

After he was handcuffed, the appellant asked to use the restroom before being taken to the police station. Detective Crawford escorted the appellant to the restroom, removed one of the appellant's handcuffs, and grabbed the appellant's pants to prevent him from trying "something." When Detective Crawford touched the seat of the appellant's pants, he felt a "wad" that was "consistent with a roll of cash." Further inspection revealed that the appellant had a roll of $84 in cash between his buttocks. Detective Crawford explained that drug traffickers often concealed drugs or cash between their buttocks because of the difficulty detecting the contraband.

Detective Crawford stated that the street value of cocaine was $150 to $200 a gram; accordingly, the value of the cocaine found at the Microtel was between $3,000 and $6,000. Detective Crawford stated that the cocaine found at the Microtel was packaged in four separate bags, one large bag, one slightly smaller bag, and two smaller bags. He opined the packaging and quantity of the drugs were indicators that the drugs were for resale. Detective Crawford said that the "blunt" found at the Microtel was a cigarette which had been hollowed out then packed with marijuana.

Later, at the police station the appellant, Gore, and Moore were interviewed. Detective Crawford said that Gore referred to the cocaine as "work." Detective Crawford explained that the term was used for cocaine that was for sale.

Detective Crawford said the appellant gave a statement to police acknowledging ownership of the marijuana in the room and the cash in his pants; however, he denied ownership of the cocaine and the money found in the room. The appellant said he put the cash in his pants so police would not find it. He said he did not know why Gore jumped out of the hotel room.

After the State rested its case-in-chief, the defense recalled Officer Hickman who stated that the cocaine was discovered one and one-half to two feet from the base of the building. He recalled that when he entered room 209, the appellant and Moore were up moving around, but they went to the bed and sat down. He said he went into the room to check on the status of the jumper.

The defense also recalled Gore who testified that jumping out the window hurt his kneecap and fingers. He said that as he jumped, a bag came flying out behind him. He acknowledged that he pled guilty to possession of cocaine with intent to sell; however, he maintained that although he intended to sell the cocaine, he never had it in his possession. He said the appellant showed him cocaine earlier that night, but he was not sure the cocaine the police found was the cocaine he saw in the appellant's possession. Gore said that when he went to the appellant's room, he thought the appellant "[m]ore than likely" still possessed the cocaine he had shown Gore earlier. Gore asserted that if the cocaine found at the hotel had been his, he would have taken it elsewhere for disposal.

Based upon the foregoing evidence, the jury found the appellant guilty of possession of 26 grams or more of cocaine with intent to sell and possession of marijuana. On appeal, the appellant challenges the trial court's denial of his motion for new trial based upon two jurors purportedly seeing the appellant while he was in custody before deliberations and the sufficiency of the evidence supporting his convictions. The State contends that the appellant's motion for new trial was not timely filed and that, therefore, this court does not have jurisdiction to hear any issue other than the sufficiency of the evidence. The appellant did not respond to the State's contention.

## II. Analysis

A. Timeliness of Motion for New Trial

-5-

Initially, we will address the State's argument regarding the untimeliness of the appellant's motion for new trial and notice of appeal. The record reflects that the appellant was sentenced on March 24, 2008, and that the judgment of conviction was entered the same day. The appellant's motion for new trial was not filed until May 2, 2008, more than thirty days after the appellant was sentenced. The trial court denied the motion on August 22, 2008, and the appellant filed a notice of appeal on August 18, 2008.

A motion for new trial must be made in writing or reduced to writing within thirty days of the "date the order of sentence is entered." Tenn. R. Crim. P. 33(b). This provision is mandatory, and the trial court has no authority to extend the time for filing. Tenn. R. Crim. P. 45(b); State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997). In the instant case, the trial court heard the appellant's motion and denied it. However, because a trial court does not have jurisdiction to hear and determine the merits of an untimely motion for new trial, the trial court's "erroneous consideration [and] ruling on a motion for new trial not timely filed . . . does not validate the motion." Martin, 940 S.W.2d at 569.

An untimely motion for new trial "not only results in the appellant losing the right to have a hearing on the motion, but it also deprives the appellant of the opportunity to argue on appeal any issues that were or should have been presented in the motion for new trial." Id. "If a motion for new trial is not timely filed, all issues are deemed waived except for sufficiency of evidence and sentencing." State v. Bough, 152 S.W.3d 453, 460 (Tenn. 2004) (citing Tenn. R. App. P. 3(e); Martin, 940 S.W.2d at 569). Thus, the appellant's issue about what two jurors saw is waived. Moreover, a late-filed motion for new trial does not toll the time for filing a notice of appeal. Therefore, an untimely motion for new trial often will also result in an untimely notice of appeal. State v. Davis, 748 S.W.2d 206, 207 (Tenn. Crim. App. 1987).

The motion for new trial was filed beyond the thirty-day time limit mandated by Tennessee Rule of Criminal Procedure 33(b). As a result, the appellant's notice of appeal was also untimely. However, "in all criminal cases the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interest of justice." Tenn. R. App. P. 4(a). In the interest of justice, we will waive the timely filing of the notice of appeal in this case to address the appellant's challenge to the sufficiency of the evidence.

## B. Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact

could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

In order to sustain the appellant's felony conviction, the State was required to prove that the appellant knowingly possessed a controlled substance, i.e. cocaine, with the intent to sell or deliver. See Tenn. Code Ann. § 39-17-417(a)(4) (2006). Possession of contraband, such as drugs, can be either actual or constructive. See State v. Transou, 928 S.W.2d 949, 955 (Tenn. Crim. App. 1996). As this court explained in State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987) (citations omitted):

> Before a person can be found to constructively possess a drug, it must appear that the person has "the power and intention at a given time to exercise dominion and control over . . . [the drugs] either directly or through others." In other words, "constructive possession is the ability to reduce an object to actual possession." The mere presence of a person in an area where drugs are discovered is not, alone, sufficient to support a finding that the person possessed the drugs. Likewise, mere association with a person who does in fact control the drugs or property where the drugs are discovered is insufficient to support a finding that the person possessed the drugs.

Furthermore, if the amount involved is twenty-six grams or more of any substance containing cocaine, the offense is a Class B felony. Tenn. Code Ann. § 39-17-417(i)(5). As to the misdemeanor conviction, the State needed to prove that the appellant knowingly possessed marijuana. See Tenn. Code Ann. § 39-17-418(a).

The proof adduced at trial reveals that the appellant showed Gore some cocaine before they went to the Microtel. While at the Microtel, Gore went to the appellant's room to drink, smoke marijuana, and obtain some cocaine to sell. Shortly after Gore went into the appellant's room, police entered the room. Gore jumped out the window and saw a white package fly out of the window beside him. Police later retrieved the package, which contained a total of 30.6 grams of cocaine base. Officers testified that the amount of cocaine

in the package was much larger than the amount typically purchased for personal use and that some of the cocaine was packaged for individual sales. Gore denied ownership of the crack cocaine. Police discovered a large quantity of money on the floor near a nightstand where marijuana was found. Additionally, Detective Crawford found a roll of $84 cash tucked between the appellant's buttocks, a common practice used by drug dealers to hide their money. Moreover, there was no evidence at trial that the appellant possessed any drug paraphernalia for his personal use of the crack cocaine. See State v. Brown, 915 S.W.2d 3, 8 (Tenn. Crim. App. 1995). The appellant admitted ownership of the marijuana and the money found on his person. Tennessee Code Annotated section 39-17-419 (2006) provides that "[i]t may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." We conclude that these facts were sufficient to sustain the appellant's convictions.

### III. Conclusion

In sum, we conclude that the appellant's motion for new trial was untimely, and, therefore, our review is limited to the sufficiency of the evidence challenge. Finding that the evidence is sufficient to support the appellant's convictions, we affirm the judgments of the trial court.

_____

NORMA McGEE OGLE, JUDGE